**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JENNIFER CRUZ, individually and as Administrator**
**of the Estate of Jose Cruz,**

               **Plaintiff,**

    **v.**                        **No. 1:19-cv-377**
                                    **(TJM/DJS)**


**COUNTY OF ULSTER, LUCAS BROOKS, and**
**JACQUELINE LOPEZ, as Administrator of the Estate**
**of Efrain Lopez,**


               **Defendants.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**


**DECISION & ORDER**

     Before the Court are the motions for summary judgment of Defendants Joseph

Brooks and the County of Ulster and Plaintiff Jennifer Cruz.  See dkt. #s 63, 64.  The parties

have briefed the issues and the Court will decide the matter without oral argument.

**I.**    **Background**

     This case concerns a murder/suicide that occurred on January 11, 2018.  On that

date, Efrain Lopez shot Margarita Soto and Plaintiff's Decedent, Jose Cruz, and then killed

himself.  Soto had been Lopez's long-time girlfriend, and Cruz had apparently begun to date

Soto.  Plaintiff alleges that Defendants Deputy Joseph Brooks and the Ulster County

violated Jose Cruz's constitutional rights by failing to respond appropriately to an alleged

1

domestic dispute that involved Lopez, Soto, and Cruz two weeks before the shootings and seeks damages pursuant to 42 U.S.C. § 1983.  Plaintiff further contends that Cruz's death came as a result of negligence by Brooks and Ulster County and raises claims under New York law.  Plaintiff's Amended Complaint also sues Lopez's estate in tort.

The Ulster County Sheriff's Department employed Defendant Deputy Lucas Brooks on December 28, 2017.  Defendants Lucas Brooks and Ulster County's Statement of Material Facts in Support of their Motion for Summary Judgment ("Defendants' Statement"), dkt. # 63-3, at ¶ 1.[1]  Deputy Brooks had graduated from the police academy in 2009 and had worked as a police officer for the Village of Ellenville, New York from that time until 2017.  Id. at ¶¶ 2-3.  During that time period, Brooks also worked as a police officer for the Village of Walden, New York.  Id. at ¶ 7.   Brooks testified that he received a variety of training, both in the field and in more formal settings.  Id. at ¶¶ 4-7.   The parties disagree about the nature and extent of this training.  Compare id. at ¶¶ 4-8 with Plaintiff's Response to Defendants' Statement of Material Facts ("Plaintiff's Response"), dkt. # 70, at ¶¶ 4-7.  The parties agree that Brooks had four weeks of field training when he began working as an Ulster County Deputy Sheriff.  Defendants' Statement at ¶ 8.  Plaintiff contends, however, that Brooks did not receive any training in handling domestic violence incidents from Ulster County until after the incidents that began on December 28, 2017.  Plaintiff's Response at ¶¶ 9-10.

On December 28, 2017, Deputy Brooks responded to a 911 call answered by Ulster

---

[1]Both parties filed the statement of material facts with citations to the record required by the Local Rules.  The Court will cite to the moving Defendants' statement for facts which are undisputed and note when the parties dispute facts.

County dispatch.  Defendants' Statement at ¶ 12.  The dispatch sent him to the Walmart store in Napanoch, New York.  Id.  When he arrived at the Walmart, Brooks found Cruz and Soto in the parking lot.  Id. at ¶ 13.  Brooks interviewed Soto, learning that she and Cruz had been approached by Soto's "'husband or boyfriend," Lopez.  Id. at ¶ 14.  Soto allegedly informed Brooks that Lopez "said something to the effect of 'How you gonna do me like that?'"  Id.  Plaintiff notes that Brooks did not memorialize this statement on the domestic incident report ("DIR") or in the written Sheriff's Office report he filed regarding that incident. Plaintiff's Response at ¶ 14.  Trooper Cody Harder, who arrived while Brooks was interviewing Soto and Cruz, testified that Soto had a "lightly concerned'" or "'lightly angry'" demeanor during the interview.  Plaintiff's Response at ¶ 15.[2]  Brooks told Harder that he did not need assistance, and Harder left the scene.  Defendants' Statement at ¶ 16.

The parties dispute the nature of a discussion that Brooks and Soto had about an order of protection.  Pointing to Brooks' deposition testimony, Defendants contend that Brooks "advised Soto about the availability of an order of protection[.]" Defendants' Statement at ¶ 17.  Plaintiff points out that Brooks' report, written at the time, indicates that Soto asked Brooks about an order of protection.  Plaintiff's Response at ¶ 17.  Soto's son reported to police after the January 11, 2018 shooting that his mother told him that police had told her that they could not obtain an order of protection.  Id.  Police told her, the son claims, that she needed to obtain such an order from Family Court.  Id.  The parties agree that the DIR indicates that Soto did not wish to make a statement.  Id.

---

[2]Defendants' Statement wrongly contends Harder referred to a "he" when describing the demeanor of the persons he and Brooks encountered in the Walmart parking lot.  See Deposition of Deputy Cody Harder, Exh. I to Defendants' Motion, at 23.

Brooks testified that Soto failed to report any prior incidents between her and Lopez. Defendant's Statement at ¶ 18.  Pointing to the DIR, however, Defendants contend that "there were reports of prior verbal arguments.  Plaintiff's Response at ¶ 18.  Further, Plaintiff points out, Soto's son told police on January 11, 2018 that Lopez "was an alcoholic with a bad temper and was verbally abusive to my mother."  Id.

Brooks also testified that Soto told him that Lopez did not have access to weapons. Defendants' Statement at ¶ 19.  Plaintiff disputes this claim because, she contends, the evidence demonstrates that Soto was aware that Lopez did have access to weapons. Plaintiff's Response at ¶ 19.  Lopez's daughter, Plaintiff points out, testified that Soto and Lopez had lived together for years, and that her mother was aware that Lopez owned guns and had persuaded him to keep them in a gun safe.  Id.  Soto would, the daughter testified, get his gun out and put it in a case to help Lopez get ready to go hunting.  Id.

Brooks interviewed Cruz, but he did not fill out a separate DIR for him.  Defendants' Statement at ¶ 20.  Defendants claim he filled out only one DIR because Brooks "believed [Cruz] to be a witness to a domestic incident involving Ms. Soto."  Id.  Plaintiff contends that Brooks did not fill out a separate DIR for Cruz because he considered the event all part of the same call, and that only one DIR needed to be completed under those circumstances. Plaintiff's Response at ¶ 20.  Plaintiff further points to testimony from Brooks that indicates that he named Cruz as a "witness" because that was the only space that fit for him on the DIR form.  Id.  Brooks also testified that he saw Cruz arguing with Lopez, which mean that he was "involved."  Id.  Brooks also admitted that he failed to include information that indicated that Cruz and Lopez had argued in the DIR.  Id.  Cruz's daughter also testified at her deposition that her father told her that Brooks did not ask him any questions.  Id.

4

Pointing to Brooks' narrative report on the incident at the Walmart, Plaintiff alleges that Soto asked Brooks about an order of protection on December 28, 2017.  Id. at ¶ 28.[3] Plaintiff alleges that no evidence exists "that Brooks asked Soto why she wanted an order of protection."  Id. at ¶ 29.  The DIR Brooks filed described Soto's emotional condition as "'upset.'" Id. at ¶ 30.  The DIR reports that Lopez made Soto "'fearful.'" Id. at ¶ 31.  The DIR records that Soto answered yes to a question on the form asking "Is the suspect capable of killing you or your children?"  Id. at ¶ 32.  Evidence indicates that Brooks did not ask Soto to explain why she answered "yes" to that question.  Id. at ¶ 33.  Soto also affirmed that Lopez was "'violently and constantly jealous of'" her.  Id. at ¶ 34.  Again, Brooks failed to ask Soto why she felt this way.  Id. at ¶ 35.  Brooks concluded that no offense had occurred before speaking with Lopez.  Id. at ¶ 36.  He told Soto that he would tell Lopez to leave her alone. at ¶ 37.  Brooks recorded in the Ulster County Sheriffs record management system that "'[s]ituation managed at this time.'" Id. at ¶ 38.  Ulster County Sheriff's Office Policy on Domestic Incidents/Violence provides, however, that "'[d]ispute mediation will not be used as a substitute for appropriate criminal proceedings in domestic violence cases.'" Id. at ¶ 39.

Deputy Brooks went to Lopez's home after he left the Walmart parking lot. Defendants' Statement at ¶ 21.  The parties agree Brooks told Lopez to "stay away" from Soto.  Id.  Plaintiff, however, argues that Brooks' conduct fell far short of accepted police practices surrounding a domestic dispute.  Plaintiff's Response at ¶ 21.  Brooks testified that Lopez's version of the events at the Walmart parking lot "corroborated" what Soto and

---

[3]Plaintiff's Response contains additional statements of material fact with citations to the record.  Defendants did not respond to such statements or seek leave to respond. The Court will cite to them to the extent that they find support in the record.

Cruz had told him.  Defendant's Statement at ¶ 22.  Plaintiff agrees that Brooks so testified, but contends that the conversation was too brief to investigate the situation adequately and failed to meet proper police standards.  Plaintiff's Response at ¶ 22.  In any case, she contends, by "corroborating" Soto and Cruz's story, Lopez admitted that he had committed Harassment in the Second Degree under New York Penal Law.  Id.  Plaintiff further contends that Brooks never asked Lopez why he was at the Walmart on December 28, 2017, how he came across Soto and Cruz, why he confronted them, and why Soto had expressed a belief that Lopez was capable of killing her and her children and was violently and constantly jealous of her.  Id. at ¶¶ 34-39.[4]  Brooks also failed to ask Lopez if he could look around his house, and never looked inside the home during the interview.  Id. at ¶¶ 40-41.  Evidence indicates that Brooks spent around three minutes at Lopez's residence on December 28, 2017.  Id. at ¶ 35.[5]

Brooks determined that no crime had been committed in the Walmart Parking lot on December 28, 2017, and did not arrest Lopez.  Defendants' Statement at ¶ 23.  While Plaintiff agrees that Brooks made this determination, she insists that the determination was incorrect and therefore constituted an improper response to the domestic incident. Plaintiff's Response at ¶ 23.  Defendants further contend that video surveillance indicates the incident in the parking spot lasted 30 seconds and did not involve any physical contact. Defendants' Statement at ¶ 24.  Plaintiff disputes the claim about the duration of the

---

[4]Plaintiff's Response starts renumbering from paragraph 29 after paragraph 39. The Court's opinion will indicate the paragraphs as stated in the Plaintiff's Response going forward, but will indicate if the numbering refers to the earlier paragraphs in a footnote.

[5]Plaintiff's Response starts renumbering at 29 for a third time after paragraph 46 of the second set of statements.  Paragraph 35 cited here comes from this third set.

incident, and also argues that Lopez's behavior indicated stalking, since he "drove a motor vehicle through a busy Walmart parking lot and then pulled almost head-to-head to Cruz and Soto's vehicle." Plaintiff's Response at ¶ 24. Neither party points to any evidence that Cruz had any other contact with the moving Defendants before his death on January 11, 2018. Defendants' Statement at ¶ 25.[6] The Ulster County Sheriff's Office did not follow up on the DIR after December 28, 2017. Plaintiff's Response at ¶ 29.

Lopez shot and killed Cruz and Soto on the morning of January 11, 2018. Defendants' Statement at ¶ 26. Lopez then committed suicide. Id. The weapon Lopez used on January 11, 2018 was stolen. Id. at ¶ 27. Video of the shootings indicates that Lopez tracked Cruz's car or its occupants. Plaintiff's Response at ¶ 33.[7] Lopez pulled into the Canal Lock Apartments parking lot immediately after Cruz parked his car. Id.

After the shooting, Soto's son told police that he had spoken to Lopez on December 28, 2017. Id. at ¶ 42. Soto's son reported that Lopez had been angry, telling him that he had seen Jose Cruz with Soto at Walmart and confronted them. Id. Soto's son then called his mother to ask about the incident. Id. She said that Lopez had "made a scene," which forced her to "call the cops." Id. Soto's son went to the Walmart and met his mother, who

---

[6]Defendants' statement is that "[t]here was no further contact between the moving defendants and Mr. Cruz prior to his death on January 11, 2018." Defendants' Statement at ¶ 25. Plaintiff denies this statement with the claim that "[t]he referenced testimony does not prove whether Cruz had contact with the County Defendants between December 28, 2017 and January 11, 2018." Plaintiff's Response at ¶ 25. Plaintiff is correct that the deposition testimony cited by the Defendants does not show any contact, but Plaintiff does not point to any proof of contact. The Court must therefore conclude that no evidence of record demonstrates any contact between Cruz and the Defendants between the incident in the Walmart parking lot and his death.

[7]This statement comes from the second set of statements that begin renumbering paragraphs.

told her that Lopez had followed her and Cruz to the Walmart, "where they got into a verbal argument and Jose [Cruz] told her to keep walking into Walmart." Id. Cruz and Lopez cursed at each other, and Lopez "said 'I'll take care of it. You'll see. Don't worry about it.'" Id. Soto's son claimed that the police told Soto that they could not get her an order of protection and she needed to go to Family Court. Id. Soto's son claimed that Lopez "ha[d] been stalking my mother" and "followed her to Walmart and knew everything about" Cruz. Id. He had "been off from work following her every move." Id. Cruz's son and daughter offered similar testimony about the Walmart incident. Id. at ¶¶ 44-46.

Plaintiff's Amended Complaint raises ten counts under state and federal law. She raises state law negligence claims against Defendants Ulster County and Deputy Brooks. Against the County, Plaintiff alleges negligent hiring, supervision, training, and retention. She also alleges negligence by Brooks and the County in handling the incident at the Walmart and subsequent events. Plaintiff also raises claims pursuant to 42 U.S.C. § 1983 against Brooks and the County. She alleges that both Defendants violated her fourteenth-amendment due process rights. Plaintiff also raises state-law claims of intentional and negligent infliction of emotional distress, assault and battery and negligence against the Estate of Efrain Lopez. The Amended Complaint also contains wrongful death claims against all the Defendants.

At the close of discovery, Defendants Ulster County and Deputy Brooks filed a motion for summary judgment. Plaintiff filed a motion for partial summary judgment against Defendant Jacqueline Lopez, as representative of the estate of Efrain Lopez. The parties have briefed the issues, bringing the case to its present posture.

**II.   Legal Standard**

8

The moving parties seek summary judgment.  It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a).  An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant is able to establish a *prima facie* basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

### III.    Analysis

The Court will address each motion in turn.

### A.    Ulster County and Deputy Brooks

Ulster County and Deputy Brooks seek summary judgment on each of Plaintiff's claims against them.  The Court will address their arguments in turn.

      **i.**    **Due Process Claims**

Defendants first argue that the Court should grant them summary judgment on Plaintiff's Fourteenth-Amendment procedural and substantive due process claims, which she brings pursuant to 42 U.S.C. § 1983.  As those claims apply different standards, the Court will address each in turn.

Plaintiff here raises a due process claim.  She complains that the moving Defendants violated Cruz's due process rights when they failed to protect him from being shot and killed by Lopez.  The Due Process Clause in the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. CONST. AMEND. XIV.  As a general matter, "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors."  Deshaney v. Winnebago County Dep't of Social Services, 489 U.S. 189, 195 (1989).  The Due Process Clause is "a limitation on the State's power to act," and does not "impose an affirmative obligation" on the state to protect life, liberty, and property.  Id.  The Clause's "purpose was to protect the people from the State, not to ensure that the State protected them from each other."  Id. at 196.

Despite this limitation, courts have concluded there are instances where a governmental body's failure to protect a citizen from private harm can constitute a due-process violation.  Plaintiff advances two theories of liability in this respect, which the Court will address in turn.

### a.     Property Right in Arrest of Lopez

Plaintiff first argues that Brooks violated Cruz's property rights by failing to arrest Lopez for stalking on December 28, 2017.  She contends that New York domestic-violence law created a property right for Cruz in that arrest, and that his injuries were a result of Brooks' failure to arrest Lopez as mandated by New York law.  "To state a claim for deprivation of property without due process of law, a plaintiff must identify a property interest protected by the Due Process Clause."  Harrington v. County of Suffolk, 607 F.3d 31, 34 (2d Cir. 2010).  A property interest protected by the Due Process clause is one where a person has "'more than an abstract need or desire' and 'more than a unilateral expectation of it.  He must, instead, have a legitimate claim or entitlement to it.'"  Id. (quoting Town of Castle Rock v. Gonzales, 545 U.S. 748, 756 (2005).  The United States Constitution does not create such "entitlements"; they instead "'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'"  Id. (quoting Castle Rock, 545 U.S. at 756).  While the interest in question arises under state law, "'*federal constitutional law* determines whether the interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause.'"  Id. (quoting Castle Rock, 545 U.S. at 757) (emphasis in original citation).

Defendants, citing to cases like Castle Rock, argue that no due process violation occurred in this case because no property right to protection from Lopez's attack existed under New York law.  Plaintiff responds that Section 140.10(4)(c) of the New York Criminal Procedure Law mandates that a person who commits a misdemeanor family offense be arrested, and that this requirement created a property right for Cruz protected by the United

States Constitution.  Officers had no discretion about whether to arrest Lopez, she insists, and failing to do so violated Cruz's due process rights.

Section 140.10(4)(c) provides, in relevant part, that "a police officer shall arrest a person, and shall not attempt to reconcile the parties or mediate, where such officer has reasonable cause to believe that: . . .  (c) a misdemeanor constituting a family offense . . . has been committed by such person against a family member or household member, unless the victim requests otherwise.  The officer shall neither inquire as to whether the victim seeks an arrest of such person nor threaten the arrest of any person for the purpose of discouraging requests for police intervention."  NY Crim. P. L. § 140.10(4)(c).  The law does not require, however, that an officer arrest a person about whom the officer has reasonable cause to believe committed such an offense if more than one person in the home appears to have violated the law.  Id.  Instead, "the officer shall attempt to identify and arrest the primary physical aggressor after considering" several factors.  Id.

Plaintiff contends that this provision creates a property right for Cruz in having Lopez arrested after Lopez followed Cruz and Soto to the Walmart parking lot and confronted them.  Plaintiff insists that the law required Brooks to make an arrest, and that this alleged lack of discretion created a property right.  She does not point to any New York or Second Circuit law that supports this understanding of the provision in question.  The Supreme Court's decision in Castle Rock undermines the Plaintiff's position, at least in part.  In that case, the plaintiff alleged that "the town of Castle Rock, Colorado, violated the Due Process Clause . . . when its police officers, acting pursuant to official police or custom, failed to respond properly to her repeated reports that her estranged husband was violating the terms of a restraining order."  545 U.S. at 750.  The estranged husband eventually killed the

couple's three children and died after police shot him.  Id. at 754.  The Court of Appeals had

concluded that the plaintiff had a property right in the enforcement of the restraining order.

Id. at 759-60.  Colorado law provided that "'[a] peace officer shall arrest, or, if an arrest

would be impractical under the circumstances, seek a warrant for the arrest of the

restrained person'" if the officer had "information amounting to probable cause" that the

restrained person knew of the order and had violated it.  Id.  at 759 (quoting Colo. Rev.

State § 18-6-803.5(3)).   The Court of Appeals pointed out that the Colorado legislature

passed these provisions in an attempt "'to alter the fact that the police were not enforcing

domestic abuse restraining orders" and thus created an "'entitlement to enforcement.'" Id. at

760 (quoting Gonzales v. City of Castle Rock, 366 F.3d 1093, 1108 (10th Cir. 2004)).

    The Supreme Court rejected the conclusion that such mandatory language created a

property right.  Id. "We do not believe," the Court found, "that these provisions of Colorado

law truly made enforcement of restraining orders *mandatory*."  Id. (emphasis in original).

After all, "[a] well established tradition of police discretion has long coexisted with apparently

mandatory arrest statutes."  Id.  A statue that actually mandated arrest "would require some

stronger indication from the Colorado Legislature than "'shall use every reasonable means

to enforce a restraining order' (or even 'shall arrest . . or . . . seek a warrant').  Id. at 761

(quoting Colo. Rev. Stat. § 18-6-803.5(3)(a)(b)).  The Court further concluded that, even in a

domestic violence situation, a statute that required arrest would not create a property right if

the alleged abuser was not present to be arrested.  Id. at 762.  In addition, the Court found

that the statute in question did not necessarily confer an entitlement for the person who

obtained an order of protection by mandating arrest by police of the violator, especially

because the person protected by the order could only "request" the initiation of criminal

contempt proceedings against the person at whom the order was aimed.  Id. at 765-66.  In the end, the Court concluded that Colorado had not "create[d] a system by which police departments are generally held financially accountable for crimes that better policing may have prevented," the State was "free to craft such a system under state law."  Id. at 768-69.

Plaintiff argues that the New York statute creates a property interest for Cruz in Lopez's arrest.  She points to findings by the New York legislature in passing the statute which find a strong state interest in preventing domestic violence, which "'warrants stronger intervention than is presently authorized under New York's laws.'"  Plaintiff's Brief in Opposition, dkt. # 68, at 5 (quoting Family Protection and Domestic Violence Intervention Act of 1994, 1994 Sess. Laws News of N.Y. Ch. 222 (S. 8642, A. 11992)).  Since "'[t]he victims of family offenses must be entitled to the fullest protections of our civil and criminal laws . . . the legislature finds and determines that it is necessary to strengthen materially New York's statutes by providing for immediate deterrent action by law enforcement officials and members of the judiciary.'"  Id. at 5-6 (quoting same).  Plaintiff contends that the language of the statute, combined with the legislative intent described above, indicates that police had "'true mandate of action.'"  Id. at 6 (quoting Castle Rock, 545 U.S. at 74).

Plaintiff's position is that the requirement of arrest upon reasonable cause to believe that a "family or household member" committed a "misdemeanor constituting a family offense" removed discretion and created a property right for Cruz.  New York Crim. P. L. § 140.10(4)(c).  Plaintiff does not point to any court decision that addresses the issue of Section 140.10(4)(c) in the context of a property right, and the Court has found none.

In a somewhat analogous context, however, the New York Appellate Division recently concluded that New York City and the New York Police Department were immune from tort

14

liability when police officers responded to a domestic dispute between a woman and her adult son, with whom she resided.  <u>Devlin v. City of New York</u>, 193 A.D.3d 819, 820 (2d Dept. 2021).  The officers "determined that no crime had been committed" and made no arrest.  <u>Id.</u>  The next day, the son "allegedly attacked his mother and brother with a baseball bat, injuring both of them."  <u>Id.</u>  The Appellate Department found that "[t]he common-law doctrine of governmental immunity shields public entities from liability for discretionary acts taken during the performance of governmental function."  <u>Id.</u> at 821.  That standard provides that "a municipal defendant cannot be held liable for the negligent acts of its employee police officers where it established that the alleged negligent acts involved the exercise of discretionary authority."  <u>Id.</u>  A discretionary act requires "'the exercise of reasoned judgment which could typically produce different acceptable results[.]'" <u>Id.</u> (quoting <u>Tango v. Tulevich</u>, 61 N.Y.2d 34, 41 (N.Y. 1983)).  Such an immunity offense does not apply "unless the municipal defendant establishes that the discretion possessed by its employees was in fact exercised in relation to the conduct on which liability is predicated." <u>Id.</u>  Immunity applies only when the municipality can show that the decision came from "the exercise of reasoned judgment which could typically produce different acceptable results." <u>Id.</u>  The Court found immunity appropriate because "officers determined that [the son] had committed a violation during the altercation with his mother."  <u>Id.</u> Since officers reasonably concluded that no misdemeanor occurred, they "were not compelled to arrest the son" under Section 140.10(4)(c).  Discretion existed under Section 140.10(4)(c) because officers reasonably concluded that none of the misdemeanors that required arrest had occurred.

Reading this case with all inferences in Plaintiff's favor, the Court might be compelled to find that no discretion existed for Brooks to arrest Lopez if evidence existed to

15

demonstrate that Brooks had reasonably concluded that Lopez had engaged in 4th degree stalking in violation of N.Y. Penal Law § 120.45 and then failed to arrest him as the law required.  Here, however, while Plaintiff argues that Brooks had reasonable cause to believe that Lopez had committed the offense, Defendants point to evidence that indicates that he lacked sufficient evidence to reach that conclusion.  Plaintiff acknowledges that a question of fact exists on that issue, and argues that Brooks did insufficient investigation to reach his conclusion that he lacked cause to arrest Lopez.  Under those circumstances the Court finds, as in <u>Devlin</u>, that Brooks exercised the discretion that the law permitted in deciding not to arrest Lopez.  Under those circumstances, no due process claim can lie.  The Court will grant the motion in this respect.[8]

### b.    State Created Danger

Defendants might also be liable under the "state-created danger" due process theory. While a governmental agency, as explained, has no general obligation to protect citizens from other citizens, "'in exceptional circumstances a governmental entity may have a constitutional obligation to provide . . . protection, either because of a special relationship

---

[8]Defendants further argue that Brooks would be entitled to qualified immunity even if the Court found a constitutional violation under the circumstances.  "Qualified immunity is an affirmative defense that shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Stephenson v. Doe</u>, 332 F.3d 68, 76 (2d Cir. 2003) (quoting <u>McCardle v. Haddad</u>, 131 F.3d 43, 50 (2d Cir. 1997)). Qualified immunity also applies when "'it was 'objectively reasonable' for [the officer] to believe that [his or her] actions were lawful at the time of the challenged act.'" <u>Betts v. Shearman</u>, 751 F.3d 78, 83 (2d Cir. 2014) (quoting <u>Jenkins v. City of New York</u>, 478 F.3d 76, 87 (2d Cir. 2007)).  Here, as explained, the question of whether a person has a procedural due process right to have an officer arrest a third party who commits certain offenses related to domestic violence in New York is not clear in a general sense, much less clearly established.  The Court would find that qualified immunity applies to Defendant Brooks if evidence of a constitutional violation existed on this claim.

with an individual, or because the governmental entity itself has created or increased the danger to the individual.'" Lombardi v. Whitman, 485 F.3d 73, 79 (2d Cir. 2007) (quoting Ying Jing Gan v. City of New York, 996 F.2d 522, 533 (2d Cir. 1993)).  Plaintiff here seeks to apply the second of those exceptions, the state created danger theory.  Under this theory, "state actors may be liable under section 1983 if they affirmatively created or enhanced the danger of private violence."  Okin v. Vill. of Cornwall-on-Hudson Police Dep't, 577 F.3d 415, 428 (2d Cir. 2009).  A simple allegation "'that police officers failed to act upon reports of past violence would not implicate the victims rights under the Due Process clause," but "an allegation that the officers in some way had assisted in creating or increasing the danger to the victim would indeed implicate those rights.'" Id. (quoting Dwares v. City of New York, 985 F.2d 94, 99 (2d Cir. 1993)).   Thus, "[t]he affirmative conduct of a government official may give rise to an actionable due process violation if it communicates, explicitly or implicitly, official sanction of private violence."  Id. at 429.  This standard "creates a high bar for a plaintiff to clear, and it has generally been hurdled only when the state affirmatively creates a danger that results in the likelihood of physical harm or death."  Hirsch v. City of New York, 751 Fed.Appx. 111, 115 (2d Cir. 2018).  In cases where officers do not explicitly assure the aggressor that violence will not be punished, a plaintiff can show "*implicit* communication only through a showing of 'repeated, sustained inaction by [officers] in the face of potential acts of violence.'" Torres v. Graeff, 700 Fed. Appx. 80, 81 (2d Cir. 2017) (quoting Okin, 577 F.3d at 428-30) (emphasis in original).

The evidence related above does not support Plaintiff's state-created danger due process theory.  The evidence in this case, making all inferences in Plaintiff's favor, indicates that on December 28, 2017, Defendant Brooks investigated a call of a

confrontation between Lopez and Cruz and Soto in a Walmart parking lot.  Soto told Brooks

that she feared lethal violence from Lopez.  Brooks went to Lopez's home and spoke with

him briefly about the incident. Fourteen days later, on January 11, 2018, Lopez shot and

killed Soto, Cruz, and himself.  No evidence indicates that Brooks–or any other member of

the Ulster County Sheriff's Office–explicitly informed Lopez that he would not face

punishment for any violence directed towards Soto or Cruz.  No evidence indicates any

police calls regarding Lopez, Soto, or Cruz arose between December 28, 2017 and January

11, 2018.[9]  The record does not provide any indication that police had earlier been called to

the home that Lopez and Soto had shared to respond to a domestic incident.  Nothing in the

record establishes a repeated pattern of calls to address conflicts between Lopez and Soto

or Lopez and Cruz such that Lopez could have construed inaction by officers as an implicit

communication that violence towards Soto and Cruz would not be punished.  The evidence

in this case establishes that Brooks responded to a single incident, made no explicit

assurances, and never responded to another incident until the tragic events of January 11,

2018.  Such conduct does not represent the sort of "repeated, sustained inaction by

government officials, in the face of potential acts of violence" that "might constitute prior

assurances rising to the level of affirmative condoning of private violence, even if there is no

explicit approval or encouragement."  Okin, 577 F.3d at 428.  Under the circumstances, no

_____

[9]Plaintiff's arguments with respect to this claim are not persuasive.  Plaintiff points to failings in Brooks' investigation, such as his failure to recognize that Soto's answers to questions on the DIR indicated danger, his failure to seek access to videotapes at the Walmart that would have demonstrated Lopez's stalking, and his failure to pursue an investigation that would have demonstrated troubling behavior by Lopez before the shooting.  As unfortunate as these failings turned out to be, nothing indicates that such failings somehow affirmatively or impliedly signaled to Lopez that violent conduct would not be punished.

reasonable juror could find that Brooks violated Soto's due process rights under a state-created danger theory.  The Court will therefore grant Defendants' motion on this basis as well.

### ii.    Municipal Liability

Defendant Ulster County argues that no evidence supports any Section 1983 liability against that municipality.  Municipal liability is limited under Section 1983 by <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658 (1978).  In that case, the Supreme Court found that municipal liability existed "where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation."  <u>Segal v. City of New York</u>, 459 F.3d 207, 219 (2d Cir. 2006).  To prevail, a plaintiff must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."  <u>Bd. of County Commr's v. Brown</u>, 520 U.S. 397, 403 (1997).  "A government's official policy may be 'made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'"  <u>Dangler v. New York City Off Track Betting Corp.</u>, 193 F.3d 130, 142 (2d Cir. 1999) (quoting <u>Monell</u>, 436 U.S. at 694).  Here, Plaintiff argues that the County is liable for failing to train officers to respond in a proper fashion to domestic dispute claims.

While Plaintiff has produced evidence of deficiencies in training by the Ulster County Sheriff's office, the Court has explained that she has not produced evidence of an underlying constitutional violation.  Under those circumstances, Plaintiff cannot establish any municipal liability for a constitutional claim.  <u>See</u> <u>Segal v. City of New York</u>, 459 F.3d 207, 219 (2d Cir. 2006) ("*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal origanization where that organization's failure to trian, or the policies or customs that it has sanctione, led

19

to an independent constitutional violation.").  The Court will therefore grant the Defendant

County's motion for summary judgment on Plaintiff's Section 1983 claims.

### iii.    State Law Claims

Defendants also seek summary judgment on Plaintiff's state-law negligence claims

against them, or in the alternative, request that the Court decline to consider such claims

after having dismissed all the federal causes of action. The only basis for this Court's

continuing jurisdiction over the remaining claims–which all arise under New York law–is

supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).  See 28 U.S.C. § 1367(a)

(providing that "in any civil action of which the district courts have original jurisdiction, the

district courts shall have supplemental jurisdiction over all other claims that are so related to

the claims in the action within such original jurisdiction that they form part of the same case

or controversy under Article III of the United States Constitution.").  Of course, the Court

"may decline to exercise supplemental jurisdiction . . . if . . . (3) the district court has

dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  "Courts

must consider 'the values of judicial economy, convenience, fairness, and comity' when

deciding whether to exercise supplemental jurisdiction."  Kroshnyi v. U.S. Pack Courier

Servs., 771 F.3d 93, 102 (2d Cir. 2014) (quoting Carnegie-mellon Univ. v. Cohill, 484 U.S.

343, 350 (1988)).  Still, "if a plaintiff's federal claims are dismissed before trial, 'the state

claims should be dismissed as well.'" Brzak v. UN, 597 F.3d 107, 113-114 (2d Cir. 2010)

(quoting Cave v. E. Meadow Union Free Sch. Dist., 514 F.3d 240, 250 (2d Cir. 2008)).

The Court will decline to exercise supplemental jurisdiction over the state-law claims.

The Court finds that, despite the length of time that the case has been pending in this court,

the interests of judicial economy, convenience, and fairness would be best served by

declining to exercise supplemental jurisdiction over the state-law claims.  The Court here is

guided in part by the lack of federal claims and in part by the interest of the State of New

York in the question of how municipalities can be liable for negligence.  That question is a

complicated one in state law, and state courts should be able to evaluate such questions.

> Moreover, even
>
> [w]here a state law claim would be barred by the statute of limitations, courts
> in the Northern District have still declined to exercise supplemental jurisdiction
> as the remaining state law claims would be protected by New York Civil
> Procedure Law and Rules § 205(a), which allows for a tolling of the statute of
> limitations. *See* N.Y. C.P.L.R. § 205(a); Yupa v. Country Stone & Fence, 2017
> WL 27957, at *5 (E.D.N.Y. 2017); Trinidad v. New York City Dept. of
> Correction, 423 F. Supp. 2d 151, 169 (S.D.N.Y. 2006).  Further, 28 U.S.C. §
> 1367(d) provides that the period of limitations for any supplemental claim
> "shall be tolled while the claim is pending and for a period of 30 days after it is
> dismissed unless State law provides for a longer tolling period." 28 U.S.C. §
> 1367(d).

Tooly v. Schwaller, 7:13-CV-1575 (DNH/ATB), 2019 WL 1639942, at *2 (N.D.N.Y. Apr. 16,

2019).  Thus, because "the applicable statute[s] of limitations would not bar [Plaintiff] from

re-filing [her state-law claims] in New York state court, there is 'no unfairness in declining to

exercise supplemental jurisdiction.'" Id. (quoting Rizvi v. Town of Wawarsing, 654 Fed.

Appx. 37, 40 (2d Cir. 2016)).  As such, the Court will decline to exercise supplemental

jurisdiction over the state-law claims and dismiss those claims without prejudice to Plaintiff

refiling them in state court within thirty days of the date of this order.

> **B.     Plaintiff's Motion**

Plaintiff seeks summary judgment on her claims against the estate of Jose Cruz.

Defendant has not responded to the motion. Plaintiff raises five claims against Lopez's

estate: wrongful death, and survival claims of emotional distress, assault and battery, and

negligence.  Plaintiff contends that the evidence is uncontroverted that Lopez intentionally

shot and killed Cruz and Soto on January 11, 2018.

All these state-law claims are before this Court pursuant to supplemental jurisdiction. Plaintiff's Amended Complaint invokes jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. §§ 1343(a)(3) and 1343(a)(4), which rely on federal law for jurisdiction. The Amended Complaint also alleges supplemental jurisdiction over the state-law claims, citing 28 U.S.C. § 1367. Thus, Plaintiff's claims against the Lopez estate are claims arising only pursuant to supplemental jurisdiction. For the reasons stated above, the Court will decline to exercise jurisdiction over those claims and dismiss them without prejudice to Plaintiff refiling them in state court pursuant within thirty days.

IV. **CONCLUSION**

For the reasons stated above, Defendants' Brooks and Ulster County's motion for summary judgment, dkt. # 63, is hereby GRANTED. Summary judgment is granted to the Defendants on the federal claims raised in Plaintiff's Amended Complaint. The state-law claims in the Amended Complaint are hereby DISMISSED without prejudice to refiling in the appropriate state court within thirty days of the date of this order. Plaintiff's motion for summary judgment, dkt. # 64, is hereby DENIED. The Court declines to exercise supplemental jurisdiction over the claims that are the subject of that motion. Plaintiff's claims against Jacqueline Lopez, as Administrator of the Estate of Efrain Lopez are hereby DISMISSED without prejudice to Plaintiff re-filing those claims in the appropriate state court within thirty days of the date of this order. The Clerk of Court is directed to CLOSE the case.

**IT IS SO ORDERED.**

22

Thomas J. McAvoy
Senior, U.S. District Judge

Dated: September 13, 2022